2008 VT 83



State v. Laprade
(2007-023)

 

2008 VT 83

 

[Filed 13-Jun-2008]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40
as well as formal revision before publication in the Vermont Reports. 
Readers are requested to notify the Reporter of Decisions, Vermont Supreme
Court, 109 State Street,
 Montpelier, Vermont05609-0801 of any
errors in order that corrections may be made before this opinion goes to press.

 

 


 2008 VT 83
 
  


 No. 2007-023
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 District Court of Vermont,
 
 
  
 
 
 Unit No. 2, Chittenden Circuit
 
 
  
 
 
  
 
 
 Ricky Laprade
 
 
 November Term, 2007
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Michael
 S. Kupersmith, J.
 
 
  
 Thomas Donovan, Jr., ChittendenCountyState’s
 Attorney, and Pamela Hall Johnson, Deputy 
   State’s Attorney, Burlington, for
 Plaintiff-Appellee.
 
  

Charles Martin of Martin & Associates, Barre, for Defendant-Appellant.

 

 

PRESENT:  Reiber, C.J.,
Dooley, Johnson, Skoglund and Burgess, JJ.

 

 

¶ 1.            
REIBER, C.J.   Defendant Ricky Laprade
appeals his convictions for first-degree aggravated domestic assault, 13 V.S.A.
§ 1043(a)(1), and unlawful trespass, 13 V.S.A. § 3705(d).  Defendant
contends that the trial court violated the Vermont Rules of Evidence and denied
him his right to a fair trial by admitting evidence of his prior abuse of the
domestic-assault victim and his conviction for domestic abuse.  He also
argues that the court erred in admitting expert testimony regarding battered
woman syndrome (BWS) without a proper foundation for its relevance.  We
affirm.

¶ 2.            
On June 14, 2004, defendant’s former girlfriend, C.B., called the police
and claimed that defendant had just entered her apartment without permission
and strangled her with a cord while she lay sleeping.  C.B. managed to
escape and called the police.  When the police responded, they did not
find defendant.  He was ultimately apprehended four days later, when the
police discovered him in some bushes about one hundred yards from C.B.’s apartment.

¶ 3.            
Before trial, the State filed a notice of its intent to introduce
evidence of several prior bad acts involving defendant and C.B.  See V.R.Cr.P. 26(c) (“When the state in a criminal action
intends to offer evidence of other criminal offenses under Rule 404(b) of the
Vermont Rules of Evidence, . . . [it] shall furnish to the other parties . . .
a written statement of the acts or offenses it intends to offer.”).  The
State took the position that “these prior incidents of abuse are admissible at
trial pursuant to the holding in State v. Sanders, 168 Vt. 60, [716 A.2d
11] (1998).”   Specifically, the State quoted Sanders
for the proposition that the prior acts were relevant because “[w]ithout knowing the history of the relationship between the
defendant and the victim, jurors may not believe the victim was actually abused,
since domestic violence is ‘learned . . . controlling behavior aimed at gaining
another’s compliance’ through multiple incidents.”  (quoting id. at
62, 716 A.2d at 13) (internal citation omitted).

¶ 4.            
First, the State proposed to introduce evidence of an incident on June
11, 2004, when a Burlington police officer responded to a call from C.B. 
According to the report, the officer responded to a call from a neighbor who
reported that defendant was holding C.B. against her will in a bedroom. 
Upon arriving at the scene, the police officer found C.B. with “red marks near
her eyes as if she had been struck in the face” and “scratches and welts on her
left arm.” C.B. told the officer that defendant had come uninvited into
her home and had hit her in the face, but that she would not say so in
court.  When C.B. asked the officer what she could do to keep defendant
away from her, the officer suggested a temporary restraining order (TRO) and
drove C.B. to the police station so she could apply for one.  Upon
arriving at the station, C.B. had a change of heart and decided to apply for a
no-trespass order (NTO) instead of the TRO, because she could get an NTO
without writing out the allegations of abuse.  The officer then drove C.B.
back to her house; as C.B. was walking up the front steps, she abruptly
reversed course and returned to the cruiser because defendant was on the
porch.  The officer then issued the NTO to defendant, who claimed he was
there only to retrieve a backpack.  Shortly thereafter, C.B.’s then-current boyfriend, P.W., arrived at the
house.  Defendant “began looking at [P.W.] and told him that they would
‘dance’ later.”  The officer advised defendant that this behavior
was inappropriate, that defendant was not to call C.B. come to her house, or go
to her workplace, and that, if he did, a stalking charge might be
pursued.  No charges resulted from the June 11 incident.

¶ 5.            
The second act the State sought to introduce occurred on April 29, 2003
and resulted in defendant pleading guilty to domestic assault on March 1, 2004. 
On April 29, the police were dispatched to a South Burlington motel where
defendant and C.B. were staying, based on a third-party report of a domestic
assault in progress.  Upon their arrival at the motel, the two officers
heard a woman scream from inside Room #37; when they knocked on the door to
that room, C.B. opened it and told them she wanted to “leave and go home.” 
She further told the officers that defendant had hit her several times that
day, and that she was “used to it by now.”   She had a large
red mark on her neck, and her cheeks and head appeared bruised.  At the
station, C.B. stated that defendant had strangled her, that he hit her very
hard, that he was “extremely jealous,” and that “maybe it is her fault that he
hits her.”  Based on the events of April 29, defendant ultimately
pled guilty to misdemeanor domestic assault, 13 V.S.A. § 1042, and was
sentenced to two to twelve months’ imprisonment.[1]

¶ 6.            
The State also moved to introduce evidence of defendant’s
“flight/furlough status.”  That motion averred that defendant was
on furlough and was required to report to the Department of Corrections (DOC)
on June 11, 2004.  Defendant did not do so, and was placed on “[e]scape” status.  The State argued that
defendant’s furlough status, and the fact that he was on escape status on June
14, should be submitted to the jury as evidence of flight, which “tends to show
consciousness of guilt.”

¶ 7.            
After a pretrial hearing on the prior bad acts, the court ruled that the
evidence of the April 29 incident was admissible under Sanders “to show
the context of the relationship between these two people.”

¶ 8.            
Defendant’s only defense at trial was that he could not have perpetrated
the garroting because he was visiting his children and ex-wife in Barre at the time of the assault.  Defendant called
two alibi witnesses: his ex-wife and her partner.  Both testified that
defendant was in Barre on the weekend of June 14,
2004.   Defendant’s ex-wife also testified, without objection, that
he physically abused her during their marriage.  She noted that,
although she and defendant had divorced, she did not limit his access to their
children, except that she would not take them to visit him in jail.

¶ 9.            
In further support of defendant’s claim that he could not have been the
assailant, he contended at closing argument that, given his history with C.B.,
he would have known better than to leave behind the cord.  The
trial court gave several limiting instructions to the jury, including the
following instruction regarding the prior bad acts:

You
were presented with evidence which you may conclude showed that the defendant
assaulted [C.B.] on occasions other than the one charged here.  This
evidence . . . has been offered only for the purpose of showing you the nature
of the relationship between [defendant and C.B.]

 

Let
me tell you what you cannot use the evidence of prior assaults for.  One,
you cannot use the evidence to conclude that the defendant is a bad person or a
person of bad character, and two, you cannot use the evidence to conclude that
because the defendant may have assaulted [C.B.] in the past . . . that he
[therefore] assaulted her on this occasion.

 

The jury returned guilty verdicts
on the unlawful trespass and aggravated domestic assault charges, and this
appeal followed.

I. 
Prior bad acts

¶ 10.        
Defendant contends that the trial court abused its discretion in
“allowing the prosecution to introduce evidence of prior bad acts and a prior
conviction of [defendant] of domestic assault.”  It is not
altogether clear which specific acts defendant now means to contest.  In
his “Statement of the Facts and Case,” defendant mentions three prior bad acts:
(1) the incident on April 29, 2003, which resulted in a domestic-assault
conviction on March 1, 2004; (2) defendant’s furlough status and violation; and
(3) the prior confrontation between defendant and C.B. on June 11,
2004.   He also mentions C.B.’s testimony
about “unspecified times” when defendant had hit her prior to the charged
conduct.  The remainder of defendant’s brief, however, focuses exclusively
on the April 29 incident and offers no specific argument regarding either the
June 11 incident, the “unspecified” incidents, or the furlough evidence. 
Accordingly, any claims of error related to the June 11 incident, the
“unspecified” incidents, or defendant’s furlough status are waived. 
V.R.A.P. 28(a)(4); Johnson v. Johnson, 158 Vt. 160, 164 n.*, 605 A.2d
857, 859 n.* (1992).

¶ 11.        
The remaining act that was admitted under Rule 404(b) is the April 29
incident.  Defendant now objects to the admission of both “the facts
surrounding the conviction” and the conviction itself.  Defendant
stipulated at trial to the admission of the conviction itself, however, as well
as the information. [2] 
Thus any claim of error as to the admission of the conviction itself was not
preserved for appeal.  Id.  Accordingly, we consider only the
evidence of the facts underlying the conviction.  That evidence consisted
of testimony from one of the responding officers, and from C.B.

¶ 12.        
First, the jury heard testimony from Officer Maxfield,
who responded to the 911 call on April 29, 2003.  The officer testified
that, when she located C.B. at the motel on April 29, C.B. was “emanating
fear,” had a “red mark underneath her neck,” and that C.B.’s
cheeks were “very, very flushed . . . to the point that they looked bruised,”
and that she had “a bruise-like area on her forehead, a little dried blood.”
 Officer Maxfield testified that defendant
was at the scene, but offered no testimony about the details of the
assault.  Defendant did not object to these portions of the officer’s
testimony.  C.B. also testified, albeit minimally, about the facts of the
April 29 incident.  When asked what happened that day, she testified that
defendant had locked her out of their motel room after an argument, and when
she “[f]inally got in . . . I don’t know, he must
have—he hit me and then I fell down.”  Defendant did not object to this
testimony.

¶ 13.        
 Evidence of “other crimes, wrongs, or acts” is not admissible,
under the Vermont Rules of Evidence, to prove character in order to show that a
person acted in conformity therewith.  V.R.E. 404(b).  Such evidence
is, however, admissible for “other purposes, such as proof of motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or
accident.”  Id.  The list of other purposes in Rule 404(b) is
not exhaustive.  State v. Longley, 2007 VT 101, ¶ 16, ___ Vt. ___,
939 A.2d 1028.

¶ 14.        
Our review of the trial court’s admission of evidence under Rule 404(b),
therefore, includes two steps: first, whether the evidence was relevant and
material to the cause of action, State v. Parker, 149 Vt. 393, 398, 545
A.2d 512, 515 (1988), and if so, whether the evidence was more probative than
unfairly prejudicial, see V.R.E. 403; Parker, 149 Vt. at 400-01,
516-517.

a. 
V.R.E. 404(b)

¶ 15.        
Defendant contends that the trial court erred in determining that the
testimony about the April 29 assault was relevant under Sanders, 168 Vt.
at 62, 716 A.2d at 13.  There, we upheld the admission of testimony
regarding a domestic-assault defendant’s prior uncharged abusive behavior
against the victim, because “the evidence was relevant . . . to portray the
history surrounding the abusive relationship, providing the needed context for
the behavior in issue.”  Id.  We found further support for
admitting the evidence in our conclusion that the “prior history of abuse gives
the jury an understanding of why the victim is less than candid in her
testimony and allows them to decide more accurately which of the victim’s
statements more reliably reflect reality.”  Id. at 63, 716 A.2d at
13.  But it is not entirely clear from the opinion in Sanders
whether, on the stand, the victim recanted about the charged incident or about
the prior, uncharged conduct.[3]

¶ 16.        
Since Sanders, we have revisited the “context” theory in two
other pertinent cases.  The first, State v. Hendricks, involved a
domestic-assault charge based on a single incident of violence.  The Hendricks
defendant had a prior conviction for domestic assault involving the same
victim.  The State sought to introduce evidence of the prior conviction,
its surrounding facts, and an uncharged incident in which the defendant had
allegedly “assaulted the victim in front of their daughters by beating her head
into the ground.”  Id. at 138, 787 A.2d at 1275.  Citing Sanders,
we stated that

this case presents
exactly the circumstances to which the reasoning of Sanders
applies.  The jury was presented with a single act of domestic
violence.  Defendant asserted that his actions during the incident were in
self-defense, and that injuries to the victim occurred either in defending
himself or as a result of the victim’s previous accidental fall.

 

Id. at 139, 787 A.2d at
1276.  We concluded that the evidence was relevant and material “ ’to
provide the jury with an understanding of defendant’s actions on the date in
question.’ “  Id. (quoting Sanders, 168 Vt. at 62, 716 A.2d
at 13).

¶ 17.        
As noted above, the two concurring Justices in Hendricks took
different views of what this Court actually held in Sanders. 
Justice Dooley characterized Sanders as a narrow opinion, and noted that
it was premised in large part on the need for the jury to be presented with
adequate evidence to make a fully informed credibility determination when “the
victim is not telling all she knows.”  Id. at 145, 787 A.2d at 1280
(Dooley, J., concurring).  Justice Dooley also stated that the victim in Sanders
recanted only about the prior abuse, and that “it would not make sense to read Sanders
as allowing evidence of prior bad acts only if the victim recants her statement
that the prior bad acts occurred.”  Id. at 143, 787 A.2d at 1279
(Dooley, J., concurring).  

¶ 18.        
Justice Skoglund, writing separately, also
concurred in the result, noting that the prior bad acts evidence was properly
admitted in Hendricks to rebut the defendant’s self-defense claim. 
She also agreed that “[i]n certain circumstances, it
would be unfair to allow the jury to evaluate the victim’s credibility—for
example, when the victim has acted in a manner seemingly at odds with the claim
of abuse—without full knowledge of the dynamics of the relationship between the
accuser and the accused.”  Id. at 147, 787 A.2d at 1282.  But Hendricks,
she went on to state, was not that case: the victim had not “recanted her
complaint of abuse, refused to testify, or behaved in a way that made her claim
of assault seem incongruous.”  Id. at 149, 787 A.2d at 1283. 
Justice Skoglund also contended that the Sanders
victim had recanted as to both the prior bad acts and the charged
conduct.  Id. at 150 n.3, 787 at 1284 n.3.

¶ 19.        
We recently relied on Sanders once again, concluding that
evidence of prior assaultive conduct against the same
victim was relevant in a trial for first-degree domestic assault.  Longley,
2007 VT 101, ¶ 17.  In that case, we affirmed the trial court’s decision
to admit, under Rule 404(b), evidence of the defendant’s “prior assault,
threats, and stalking of the complainant” as probative of both context and
motive.  Id. ¶ 19.

¶ 20.        
We conclude that the prior bad acts evidence admitted here was relevant
to show context under the facts of this case.  C.B. testified at trial
that, although defendant had hit her “[a] lot” during their relationship, she
had never reported the conduct to the police.  She testified specifically
about three separate incidents in hotels where defendant had hit her, and
defendant did not object to the testimony.  C.B. then
testified—also without objection—that, despite the ongoing violence, she paid
both for the hotel stays and for her own apartment.  She further
testified that she bailed defendant out of jail after the April 29 arrest
because she “felt bad” for him and “felt sometimes it was [her] fault too”
because “[m]aybe [she]
aggravated too much.” C.B. then testified that, after the June 11 incident, she
“really didn’t want [defendant] to go to jail” because “he was already in
trouble.”

¶ 21.        
Moreover, in the course of questioning about the charged incident, C.B.
made clear that she had never before notified the police of defendant’s
violence against her, although “[e]verybody else
did.”  C.B. also stated that she only called the police after the
strangling because she thought that “this time [she] was going to die.” 
C.B.’s testimony was that defendant—still at
large for several days—engaged in stalking-like behavior after the charged
incident.  C.B. testified that, between the charged incident and
defendant’s arrest four days later, she saw “him outside or he would yell or
he’d say let me in, let me in.”  C.B., however, did not call the police,
but rather told her landlord to do so if defendant came around the apartment
again.  Defendant did not object to this testimony.

¶ 22.        
C.B.’s testimony, as noted, was generally
unequivocal about the details of the charged incident.  This is not a case
of a victim directly recanting her testimony about the charged conduct. 
What is clear from the record, however, is that the jury might well have found C.B.’s behavior—particularly her decision not to call the police
herself when she repeatedly saw defendant near her apartment after the charged
incident—incongruous or difficult to reconcile with her claim that defendant
had recently broken into her apartment and strangled her.  This is just
the sort of incongruity that “context” evidence is meant to remedy in
domestic-violence cases.  The jury would have been unable to make an
adequate determination of C.B.’s credibility without
hearing further testimony about the nature of her relationship with
defendant.  Thus, the trial court did not err in concluding that evidence
of defendant’s April 29, 2003 assault on C.B. was relevant.  

b.  V.R.E. 403

¶ 23.        
Having concluded that the evidence of the prior bad acts was relevant,
we turn to the question of whether it was admissible.  Because defendant
failed to object at trial to the court’s failure to balance explicitly
the probative value of the evidence against its potential for unfair prejudice,
we review the decision on admissibility for plain error only.  See State
v. Muhammad, 2007 VT 36, ¶ 10, ___ Vt. ___, 927 A.2d 764 (failure to make
timely, specific objection to admission of evidence means that this Court
reviews only for plain error).  When the admission of prejudicial evidence
is claimed to be plain error, the appellant must show that the judgment below
was substantially affected by its admission.  State v. Burgess,
2007 VT 18, ¶ 17, 181 Vt. 336, 917 A.2d 528.  Defendant has not made that
showing here.

¶ 24.        
The trial court did not err in admitting the testimony about the details
of the April 29 assault.  The testimony, as noted, was brief and was no
more inflammatory than the information itself, to which defendant
stipulated.  The information stated that defendant “was a person who
recklessly caused bodily injury to [C.B.], by KICKING HER AND PUNCHING HER IN
THE FACE, in violation of 13 V.S.A. § 1042.”  By comparison, the
testimony about the April 29 assault was innocuous: C.B. testified that “I
don’t know, he must have – he hit me and then I fell down.”  Officer
Maxfield testified that C.B. was “emanating fear,”
had a “red mark underneath her neck,” that C.B.’s
cheeks were “very, very flushed . . . to the point that they looked bruised,”
and that she had “a bruise-like area on her forehead, a little dried blood.” 
The officer did not testify at all about what caused C.B.’s
injuries.  The prejudice resulting from this testimony was minimal at
worst.  Accord Longley, 2007 VT 101, ¶ 21 (“Indeed, this evidence
was relatively dull compared to the fairly damning evidence already heard and
seen by the jury.”).

¶ 25.        
As noted above, the testimony was highly probative of the context of the
relationship between defendant and C.B., and did not raise the specter of
unfair prejudice that could have resulted from testimony regarding other
victims of abuse.  See State v. Anderson, 2005 VT 17, ¶ 11, 178 Vt.
467, 868 A.2d 720 (evidence of other abuse by defendant against same victim
highly probative and not unfairly prejudicial); State v. Winter, 162 Vt.
388, 393, 648 A.2d 624, 627 (1994) (same).  The trial court did not err in
admitting the very limited testimony about the facts surrounding the April 29
assault.

II. 
Battered woman’s syndrome

¶ 26.        
Defendant also argues that the trial court erred in admitting expert
testimony regarding BWS, because the testimony was not relevant or, even if
relevant, was unfairly prejudicial.  In admitting the testimony,
the trial court ruled that the expert could testify only about the dynamics of
abusive relationships generally, and about how victims of abuse typically
respond; the court forbade testimony concerning abusers’ reactions when victims
attempt to leave the relationship, reasoning that such testimony “may be too
prejudicial” and would “go[] over the line.”  The court further
cautioned that the expert should confine her testimony to her general
knowledge, and should not comment on the parties or the specific facts of the
case.  See State v. Wetherbee, 156
Vt. 425, 431-32, 594 A.2d 390, 393 (1991) (noting that, when an expert comments
directly on witness credibility, it invades the province of the jury to
determine the credibility of witnesses and creates a risk that the expert will
be seen as a “truth detector”).  In this case, the expert testified within
the limitations imposed by the court. 

¶ 27.        
The admissibility of expert testimony is specifically governed by Rule
702 of the Vermont Rules of Evidence, and is also subject to the requirements
of Rule 403.  The question of admissibility is vested to the discretion of
the trial court, and we will reverse only for an abuse of that discretion
resulting in prejudice.  State v. Verrinder,
161 Vt. 250, 260, 637 A.2d 1382, 1389 (1993).

¶ 28.        
We considered the rationales underlying expert BWS testimony at some
length in State v. Swift: 

As the cases
recognize, a victim truly suffering from BWS will, for various complex reasons,
act in ways that may seem counterintuitive to the average juror.  It is up
to the prosecution . . . to recognize the potential for juror confusion and
offer appropriate expert testimony on BWS that will help the jury understand an
alleged victim’s actions.  See State v. Grecinger,
569 N.W.2d 189, 196 (Minn. 1997) (admitting expert testimony on BWS offered in
the state’s case-in-chief reasoning that “it could help the jury understand
behavior that might otherwise undermine the complainant’s credibility”).

 

2004 VT 8A, ¶ 21, 176 Vt. 299, 844
A.2d 802. 

¶ 29.        
The first step in the Rule 403 balancing is to determine the probative value
of the disputed testimony.  The State argues that, although C.B. did not
recant about the strangulation incident, other aspects of her testimony at
trial might have been incomprehensible to the jury without the aid of the BWS
testimony.  Specifically, the State notes that C.B. testified that
she remained in the relationship for years despite several prior instances of
abuse, that she had never reported the abuse before the strangling incident,
and that she had posted defendant’s bail after the April 29 incident.  We
further note that C.B. testified that defendant returned to her apartment after
the charged incident but that she did not call the police, instead merely
telling her landlord, “if you see him, have him arrested.”  As was
noted above in connection with the prior-bad-acts testimony, this is the sort
of superficially inexplicable or puzzling behavior that militates in favor of
admitting context evidence.  In the circumstances presented here, the
testimony was probative of C.B.’s credibility, which
jurors might otherwise have thought was undermined by her decision to remain in
the relationship for as long as she did, and by her failure to call the police
herself after the charged incident.

¶ 30.        
The State also contends that the BWS testimony was probative, in part,
because C.B. “repeatedly professed to not remember and minimized her injuries
and [defendant’s] abuse” at a pretrial motion hearing.  In light of
our conclusion that the expert testimony was probative to explain the anomalies
in C.B.’s testimony at trial, we do not rely
on her purported testimonial inconsistencies at the pretrial hearing.

Affirmed.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Chief
 Justice
 
  











[1]  The State’s notice of intent to
introduce evidence of prior bad acts also announced the State’s intent to
introduce evidence that C.B. had told two of her friends repeatedly of abuse by
defendant.  That evidence is not at issue in this appeal.





[2] 
The information states that defendant “was a person who recklessly caused
bodily injury to a household member, [C.B.], by KICKING HER AND PUNCHING HER IN
THE FACE, in violation of 13 V.S.A. § 1042.”





[3] 
Compare State v. Hendricks, 173 Vt.
132, 143, 787 A.2d 1270, 1279 (2001) (Dooley, J., concurring) (“In fact, the Sanders
opinion indicates that the victim recanted only her statements about the prior
abuse.”) with id. at 150 n.3, 787 A.2d 1284 n.3 (Skoglund,
J., concurring) (“My Brother Dooley and I disagree on what was recanted in Sanders. 
The facts of the case make clear that the victim . . . specifically recanted
prior statements concerning the charged offense, claiming on the stand that the
defendant did not have a knife and denying that she believed he was going to
kill her.”).